IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

ONEBEACON AMERICAN INSURANCE
COMPANY, f/k/a COMMERCIAL UNION
INSURANCE COMPANY and AMERICAN
CENTRAL INSURANCE COMPANY,

    Plaintiffs,

v.                                                            No. 04-2432 B
                                                                    03-2649 B (CONSOLIDATED)

JACO AIRFIELD CONSTRUCTION, INC., f/k/a
JACO ELECTRIC, INC., a Georgia corporation,
MEMPHIS-SHELBY COUNTY AIRPORT
AUTHORITY, and ILLINOIS VALLEY PAVING
COMPANY, an Illinois company,

    Defendants.

---

ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

---

This diversity action for declaratory judgment was brought by Plaintiffs, OneBeacon American Insurance Company f/k/a Commercial Union Insurance Company and American Central Insurance Company (collectively "OneBeacon"), for a determination of their rights and obligations under an insurance policy issued to Defendant, JACO Airfield Construction, Inc. f/k/a Jaco Electric, Inc. ("JACO"), with respect to an underlying lawsuit in which JACO was joined as a third-party defendant on a claim for indemnification.[1]  Before the Court is the motion of OneBeacon for

---

[1] In Memphis Shelby County Airport Authority v. Illinois Valley Paving Company, Civil Action No. 01-3041 (W.D. Tenn.), Memphis Shelby County Airport Authority ("MSCAA") filed suit against Illinois Valley Paving Company ("IVP") claiming that IVP breached its contract with MSCAA because the airfield lighting system IVP contracted to provide failed to meet specifications due to the lighting system containing defective cable. IVP brought a third-party

1

summary judgment. The Defendants have responded, OneBeacon has replied and this motion is now appropriate for disposition. For the reasons set forth below, the Plaintiffs' motion for summary judgment is GRANTED.

## BACKGROUND

### THE UNDERLYING CASE

The following facts are undisputed unless noted. On April 18, 1998, MSCAA and IVP entered into a contract ("Construction Contract") pursuant to which IVP agreed to act as general contractor for the reconstruction and extension of a portion of Runway 18C-36C and related taxiway (collectively referred to as the "World Runway") at the Memphis International Airport ("Project 6500"). (Am. Compl. ¶ 4, Ex. A). On December 28, 2001, MSCAA filed the instant action against IVP[2] alleging that it breached the Construction Contract by installing underground airport lighting cable that did not conform to Specification Item L-108 of the contract requiring that such cable be made of cross-linked polyethylene insulation.[3] (Am. Compl.¶ 21).

---

action against JACO seeking indemnification for any alleged damages suffered by MSCAA on the basis that JACO acted as the airfield lighting subcontractor on the project at issue. JACO subsequently filed claims against Graybar Electrical Works Company and Nehring Electric Company, Inc., the seller and manufacturer respectively, of the allegedly defective cable, for damages JACO suffered in this construction project as well as in two other projects. IVP later filed a cross-claim against both Nehring and Graybar.

[2]MSCAA subsequently amended its complaint on September 22, 2003 to name Fireman's Fund Insurance Co. as an additional defendant.

[3]   Specification Item L-108 provides that

[u]nderground cable shall conform to the requirements of AC 1504/5345-7, Specification for L-824 Underground Electrical Cable for Airport Lighting Circuits. Type C single and multiple conductor cables rated 600 volts and 5000 volts shall have a minimum .110 cross-linked polyethylene insulation. Multiple conductor cable shall have an overall jacket.
     (a) Cable for airfield lighting service shall be No. 8 AWG, type C,

Prior to entering into the contract with MSCAA, IVP subcontracted with JACO for the installation of the electrical cable and airfield lighting system. (Am. Compl. ¶ 7). The cable installed by JACO on Project 6500 was supplied by Graybar Electrical Co., Inc. ("Graybar") and manufactured by Nehring Electrical Works Co. ("Nehring"). (Def. IVP's Response to MSCAA's Mot. Summ. J. at 2). The subcontract required JACO to comply with the provisions of the Construction Contract between IVP and MSCAA[4] (IVP's Statement of Undisputed Material Facts ¶ 11; Id., Ex. E). The subcontract further provided that JACO would be held liable for any defective work or material as long as IVP was liable under the Construction Contract. (Id. ¶ 17).

Testing of various samples of cable from project 6500 revealed that some of the samples failed to meet FAA requirements for the degree of cross-linking. (Am. Compl.¶ 10). Because it contended that non-conforming cable was installed, MSCAA never gave final acceptance on Project 6500. (Joseph M. Polk ("Polk") Dep. at 132-33). Instead, the Airport Authority contacted IVP and requested that it replace cable. (Am. Compl. ¶ 18). After IVP refused to do so, MSCAA opted, in May 2002, to have the cable removed and replaced by another company. (Order Granting

---

>    copper, 7-strand, single conductor cable with 5,000 volt cross-linked polyethylene insulation.

(Am. Compl. ¶ 9).

[4]Article One of the Subcontract provides:

>    The General Contract, as the term is used herein, also includes all documents appurtenant thereto including, but not limited to (1) Plans, (2) Specifications, (3) Drawings, (4) General and Special Conditions, (5) Addenda, and (6) _____ (list other documents). The General Contract is hereby made a part of this Agreement. <u>The SUBCONTRACTOR will adhere to and be bound by all the requirements of the General Contract.</u>

(Emphasis added).

MSCAA's Mot. Summ. J. at 5).

THE INSURANCE CONTRACT

OneBeacon issued and delivered a total of seven insurance policies, some of which related to the World Runway project, to JACO at their offices in Georgia. (Pls.' Statement of Undisputed Facts in Supp. Mot. Summ. J. ¶ 54) ("Pls.' Facts"). Of relevance to the instant motion, OneBeacon issued a commercial general liability ("CGL") policy to JACO which had a coverage period from July 1, 1998 to July 1, 1999 and another CGL policy with coverage from July 1, 1999 to July 1, 2000. (Pls.' Facts ¶¶ 55, 57). Both policies contained the following operative language:

> a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
> b. This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
> (2) The "bodily injury" or "property damage" occurs during the policy period.

(Pls.' Facts, ex. F-1, at 1). The policy then defines "occurrence" to mean "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Id., ex. F-1, at 10). It defines "property damage" to mean (1) "[p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it" or (2) "[l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."

4

(Id.).

OneBeacon also issued to JACO three umbrella policies covering a period from May 20, 1998 to July 1, 2000. The umbrella policies contained the following general language:

> [OneBeacon] will pay those sums that the "insured" becomes legally obligated to pay as damages in excess of "underlying insurance," or of the "self-insured retention" when no "underlying insurance" applies, because of "bodily injury," "property damage," "personal injury" or "advertising injury" to which this insurance applies.

(Pls.' Facts, ex. F-2, at 1). These policies further provided that this coverage "applies only to 'bodily injury' or 'property damage' which occurs during the policy period. The 'bodily injury' or 'property damage' must be caused by an 'occurrence' which takes place anywhere." (Id.). The excess coverage policies further explain property damage and bodily injury as follows:

> (a) Damages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.[']
> (b) 'Property damage' that is loss of use of tangible property that is not physically injured shall be deemed to occur at the time of the 'occurrence' that caused it.

(Id.).

In addition to JACO, OneBeacon included in this declaratory judgment action IVP and MSCAA[5], as "potential judgment creditors" of the Plaintiffs' insured.

## STANDARD OF REVIEW

Rule 56( c) provides that a

> judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to

---

[5]This Court has previously granted MSCAA's motion to dismiss the declaratory action against it. (Order Granting MSCAA's Mot. to Dismiss Oct. 11, 2005, at 1).

a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms., Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324, 106 S. Ct. at 2552. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586, 106 S. Ct. at 1356. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S. Ct. at 2552. In this circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge may not make credibility determinations or weigh the evidence." Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

## ANALYSIS

The Plaintiffs contend that they are entitled to summary judgment because "JACO's

installation of [defective] cable does not constitute an 'occurrence' under the OneBeacon policies." (Pls.' Mem. in Supp. Mot. Summ. J. at 17). They further claim that the "business risk" provisions of the CGL policy specifically exclude from coverage the events giving rise to the underlying lawsuit. The Defendants counter that the cracking of the cable, which they claim was caused by environmental stress, does constitute an "occurrence" under the OneBeacon policies. The Plaintiffs further submit that the Defendants simply ignore clearly applicable Georgia law, which they assert applies to this diversity action.

CHOICE OF LAW

A United States district court exercising diversity jurisdiction applies the choice of law rules of the forum state. See Kipin Indus., Inc. v. Van Deilen Int'l, Inc., 182 F.3d 490, 493 (6th Cir. 1999). "In the absence of an enforceable choice of law clause [in an insurance policy], Tennessee courts apply the substantive law of the state in which the policy was issued and delivered." Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc., 972 S.W.2d 1, 5 (Tenn. Ct. App. 1998) (citing Ohio Cas. Ins. Co. v. Travelers Indem. Co., 493 S.W.2d 465, 467 (Tenn. 1973); Kustoff v. Stuyvesant Ins. Co., 160 Tenn. 208, 212-13, 22 S.W.2d 356, 358 (1929); Hutchison v. Tenn. Farmers Mut. Ins. Co., 652 S.W.2d 904, 905 (Tenn. Ct. App. 1983)). As the OneBeacon policies did not contain a choice of law clause and were issued and delivered in Georgia, that state's substantive law applies.

CONTRACTUAL INTERPRETATION

Under Georgia law, "[t]he construction of a contract is a [matter] of law for the court." Auto Owners Ins. Co. v. Parks, 629 S.E.2d 118, 121 (Ga. Ct. App. 2006). In ascertaining the meaning of the agreement, this Court is to afford the contractual terms "their usual and common meaning."

Claussen v. Aetna Cas. & Sur. Co., 380 S.E.2d 686, 688 (Ga. 1989).  "Georgia courts have long acknowledged that insurance policies are prepared and proposed by insurers.  Thus, if an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured."  Id.  Finally, "[i]n construing an insurance contract, a court must consider it as a whole, give effect to each provision, and interpret each provision to harmonize with each other."  S. Trust Ins. Co. v. Dr. T's Nature Prods. Co., 584 S.E.2d 34, 35-36 (Ga. Ct. App. 2003).  Because an analysis of the "business risk" exclusions in the policies resolves this dispute, the Court will begin with a discussion of these provisions.  They exclude coverage under the policy

> for        j. Damage to Property
>            "Property Damage" to:
>              . . . .
>            (6) That particular part of any property that must be restored, repaired
>            or replaced because "your work" was incorrectly performed on it.
>              . . . .
>            n. Recall of Products, Work or Impaired Property
>              Damages claimed for any loss, cost, or expense incurred by you
>            or others for the loss of use, withdrawal, recall, inspection, repair,
>            replacement, adjustment, removal or disposal of:
>              . . . .
>            (2) "Your work" . . . .

(Pls.' Facts, ex. F-1, at 1-3) (emphasis added).

In Glens Falls Ins. Co. v. Donmac Golf Shaping Co., 417 S.E.2d 197, 200 (Ga. Ct. App. 1992), the Georgia Court of Appeals discussed the purpose of the "business risk" exclusions in a CGL policy, which it found are

> designed to exclude coverage for defective workmanship by the
> insured causing damage to the project itself. Gary L. Shaw Builders
> v. State Auto. Mut. Ins. Co., 182 Ga.App. 220, 223, 355 S.E.2d 130
> (1987); Elrod's Custom Drapery Workshop v. Cincinnati Ins. Co.,
> 187 Ga.App. 670, 371 S.E.2d 144 (1988). The principle behind such
> exclusions is based on the distinction made between two kinds of risk
> incurred by a contractor . . . . The first is the business risk borne by

> the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements. This type of risk is not covered by the CGL policy, and the "business risk" exclusions in the policy make this clear. Gary L. Shaw, supra, 182 Ga.App. at 224, 355 S.E.2d 130. The second is the risk that the defective or faulty workmanship will cause injury to people or damage to other property. Because of the potentially limitless liability associated with this risk, it is the type for which CGL coverage is contemplated. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 405 A.2d 788, 791 (1979). "While it may be true that the same neglectful craftsmanship can be the cause of both a business expense of repair and a loss represented by damage to persons and property, the two consequences are vastly different in relation to sharing the cost of such risks as a matter of insurance underwriting. . . . The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage [applicable under the CGL policy] is for tort liability for . . . [injury to persons and damage to other property] and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained . . . ." (Punctuation and citation omitted.) Weedo, supra, 405 A.2d at 791.

(Emphasis added).

In Custom Planning & Development, Inc. v. American National Fire Insurance Co., 606 S.E.2d 39 (Ga. Ct. App. 2004), that same court addressed the applicability of the "business risk" exclusions to a contractual dispute over an improperly built retainage wall and stated that

> the business risk borne by the contractor to replace or repair defective work to make the building project conform to the agreed contractual requirements . . . is not covered. . . . The coverage applicable under the CGL policy is for tort liability for injury to persons and damage to other property, and not for contractual liability of the insured for

9

>   economic loss because the product or completed work is not that for which the damaged person bargained.

Custom Planning & Dev., Inc., 606 S.E.2d at 42 (emphasis added) (quoting Sapp v. State Farm Fire & Cas. Co., 486 S.E.2d 71 (Ga. Ct. App. 1977)).

JACO argues that notwithstanding the policy language and the foregoing authority, OneBeacon is not entitled to summary judgment because the defective L-824c cable was not JACO's product or work. The Court disagrees. As this Court has previously found, neither IVP nor JACO fulfilled its contractual obligations with respect to the Construction Contract. See (Order Granting IVP's Mot. Summ. J. (against JACO) Sept. 22, 2006, at 3; Order Granting MSCAA's Mot. Summ. J. (against IVP) Sept. 15, 2006, at 3). Rather, IVP through JACO installed non-conforming cable which MSCAA had to replace. As such, the Court concludes that in accordance with the holdings of Glenn Falls Insurance Co. and Custom Planning & Development, Inc. the "business risk" exclusions under subsections (j) and (n) of the CGL policies apply. Thus, the Plaintiffs' insurance policies do not afford coverage to JACO for its potential liability[6] in the underlying case based on its installation of cable for which MSCAA did not bargain. Accordingly, OneBeacon's motion for summary judgment is GRANTED.

**IT IS SO ORDERED** this 2nd day of April, 2007.

>   s/ J. DANIEL BREEN
>   UNITED STATES DISTRICT JUDGE

---

[6]This Court previously granted summary judgment in favor of IVP and against JACO, finding JACO breached its agreement with IVP when it installed defective underground L-824c cable on the World Runway. (Order Granting IVP's Mot. Summ. J. (against JACO), Sept. 22, 2006, at 3).